E-FILED
Thursday, 14 January, 2016  10:56:20 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| **BOARD OF EDUCATION OF JACKSONVILLE SCHOOL DISTRICT #117,** <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> **C.P. and O.P., as parents and next Friends of R.P., a minor, et al,** <br><br> Defendants/Counter-Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **No. 3:15-cv-3228**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SEALED OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

The Jacksonville School District has appealed a hearing officer's July 20, 2015 order regarding the education of R.P., a girl with autism who turned 10 earlier this month.  The hearing officer's order granted relief that was largely favorable to R.P.'s parents—the defendants in this case—who had removed R.P. from public school because the District was not providing R.P. with a "free appropriate public education" as required by law.  The hearing officer's order

directed the District to reimburse the parents for money spent on
R.P.'s in-home therapy, to pay for continued in-home therapy for at
least 6 months, and to develop a new education plan for R.P.
providing for in-home therapy for at least 6 months with an
eventual transition back to public school.

On September 16, 2015, the District filed a motion for a
preliminary injunction (d/e 16), asking the Court to stay the July
20, 2015 order.  R.P.'s parents oppose the motion.  On September
18, 2015, the Court entered an unopposed temporary stay of the
portion of the order that directed the District to pay certain
amounts to the parents.  For the reasons below, the Court now
LIFTS the temporary stay and DENIES the motion for preliminary
injunction (d/e 16).

## I.  Factual background

This case arises out of a dispute between the Jacksonville
School District and the parents of a now-10-year-old girl, R.P., who
has autism.  For some time, the parents and the District have not
agreed on the best special education program for R.P.  During the
2013-14 school year, for example, the parents objected to the fact
that R.P.'s desk in her second grade classroom was separated from

and faced away from her classmates.  The District viewed this placement as a necessary compromise, allowing R.P. to focus on her special needs curriculum without completely removing her from her peers in the second grade classroom.  Disputes continued throughout the 2013-14 school year, with the parents blaming the District for R.P.'s behavioral regressions—head-butting, screaming, attempting to bite herself and others, and other self-injurious behavior—and disputing the conclusions reached in the District's periodic evaluations of R.P.  The District proposed that R.P. be moved to the District's self-contained autism class, but the parents rejected this proposal.

In the summer of 2014, R.P.'s doctor and nurse practitioner both recommended that R.P. receive "home and hospital instruction" rather than going back to school, due to R.P.'s self-injurious behavior that seemed to be provoked by her fear of attending school.  The District declined to pursue this route, on the ground that R.P. did not have a medical condition that prevented her from attending school.  Instead, the District recommended that R.P. attend Hope Institute, in Springfield.

The parents declined to send R.P. to Hope Institute on the ground that the bus ride would be too lengthy to accommodate R.P.'s frequent need to use the bathroom, which was sometimes as often as every 20 minutes.  On August 17, 2014, they withdrew R.P. from the District and began home-schooling her.  During the 2014-15 school year, the parents home-schooled R.P. using "Applied Behavioral Analysis" (ABA) methods.

On February 19, 2015, the parents requested an impartial due process hearing to resolve the dispute, as was their right under 20 U.S.C. § 1415(f).  The parents argued that the District failed to provide R.P. with a "free appropriate public education" (FAPE)—required under the law—by:

(1) failing to provide R.P. with the full continuum of required services;

(2) failing to provide R.P. with a researched-based, peer-reviewed program and services when it recommended placement at Hope Institute;

(3) improperly recommending a placement (Hope) that was significantly distant from R.P.'s home and under investigation by the Department of Children and Family Services for alleged wrongdoing; and

(4) failing to provide proper notice and parental participation when it recommended a placement (Hope) without

disclosing information about the DCFS investigation into Hope.

The parents later voluntarily dropped Issue 1.

The Illinois State Board of Education appointed Dr. Michael Risen as hearing officer.  After a 6-day hearing, Dr. Risen found that a preponderance of the evidence supported the parents' claims on issues 2 and 3, but not on issue 4.  He ordered the District to reimburse the parents $10,435.62 for their costs incurred thus far, to pay for continued in-home ABA therapy for R.P. for at least 6 months, and to develop, by August 20, 2015, a new Individualized Education Plan (IEP) for R.P. that would provide for at least 6 months of continued ABA therapy and an eventual transition back to public school.

The District appealed to this Court and has asked for a preliminary injunction.  Specifically, the District seeks a stay of Dr. Risen's July 20, 2015 order.

Because Dr. Risen's order directed the District to begin payment by September 20, 2015, the Court held an initial hearing to determine whether the District's motion for preliminary injunction required action by the Court before that date.  At that

initial hearing, the parents said they had no objection to a temporary stay of the portion of the order requiring the District to reimburse the parents $10, 435.62 and to pay for ongoing ABA therapy.  The Court ordered a temporary stay of that portion of the order.

During the pendency of this appeal, the District's IEP team has continued to meet in an effort to fashion a plan for R.P.'s transition to public school as directed by Dr. Risen's order.

## II.   Relevant statutes

Under the Individuals with Disabilities Education Act (IDEA), for Illinois to be eligible for certain federal funding it must provide developmentally disabled children with a "free appropriate public education" (FAPE) that emphasizes special education and related services.  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 104.33(a).  Each child must have an "individualized education program" (IEP), devised by the school district in collaboration with the child's parents.  20 U.S.C. § 1414(d).

Parents who take issue with their child's IEP have the right to an impartial due process hearing.  20 U.S.C. § 1415(f).  Either the parents or the school district may then appeal the hearing officer's

findings by bringing a civil action in federal court.  20 U.S.C. § 1415(i)(2)(A); see also 105 ILCS 5/14-8.02a(i) ("Any party to an impartial due process hearing aggrieved by the final written decision of the impartial due process hearing officer shall have the right to commence a civil action …").

The Illinois statute provides that the "commencement of a civil action under this subsection shall operate as a supersedeas."  105 ILCS 5/14-8.02a(i).  A supersedeas "preserve[s] the status quo pending the appeal."  Stacke v. Bates, 138 Ill.2d 295, 302 (1990) (involving dispute between widow and estate).  The IDEA, meanwhile, provides that, during the pendency of "any proceedings" conducted under the IDEA, the child at issue "shall remain in the then-current educational placement."  20 U.S.C. § 1415(j).  This is known as the IDEA's "stay put" provision.  Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302, 400 F.3d 508, 509 (7th Cir. 2005).

## III.  Legal standards

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1085 (7th Cir. 2008).  To

prevail on its request for a preliminary injunction, the District must establish: (1) that it is likely to prevail on the merits; (2) that it is likely to suffer irreparable harm without an injunction; (3) that the harm it would suffer is greater than the harm R.P. would suffer if the injunction were granted; and (4) that the injunction is in the public interest.  See Dominique L. v. Bd. of Ed., No. 10-C-7819, 2011 U.S. Dist. LEXIS 19039 (N.D. Ill. Feb. 25, 2011) (listing preliminary injunction requirements for parents who sought preliminary injunction to enforce hearing officer's favorable decision); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78 (3d Cir. 1996) (in affirming denial of school district's request for stay of hearing officer's unfavorable decision, describing district court's analysis of preliminary injunction requirements).

On the merits of an appeal from an independent hearing officer's order, the Court must base its decision on the preponderance of the evidence and "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  On issues of law, the hearing officer is entitled to no deference.  Alex R. v. Forrestville Valley Cmty. Sch. Dist. #221, 375 F.3d 603, 611 (7th Cir. 2004).  On issues of fact, the Court must give "due weight" to

the hearing officer's decision.  Id.  This "due weight" standard "necessarily implies some sort of deference."  Bd. of Ed. v. Ill. State Bd. of Ed., 41 F.3d 1162, 1167 (7th Cir. 1994) (rejecting school district's argument that court should defer to school district's decision as opposed to hearing officer's decision).  The Seventh Circuit has opined that there is "sound basis for giving deference to the decisions of hearing officers," considering their "special expertise in education law."  Id. (affirming district court's decision to affirm hearing officers' decision favorable to parents).  The more new evidence the Court hears, the less the Court should defer to the hearing officer.  Alex R., 375 F.3d at 612.  Conversely, if the Court does not take new evidence and relies only on the administrative record, the Court "owes considerable deference to the hearing officer, and may set aside the administrative order only if it is strongly convinced that the order is erroneous."  Id. (quotation omitted).

## IV.   Issues

### A.   The effect of the District's appeal

A preliminary issue is the effect of the District's appeal of Dr. Risen's July 20, 2015 order.  The District argues that its appeal to

this Court "operates as a supersedeas."  See 105 ILCS 5/14-8.02a(i)

("Any party to an impartial due process hearing aggrieved by the

final written decision of the impartial due process hearing officer

shall have the right to commence a civil action .... The

commencement of a civil action under this subsection shall operate

as a supersedeas.").  The District explains that a supersedeas is

"intended to preserve the status quo pending the appeal."  Stacke v.

Bates, 138 Ill.2d 295, 302 (1990) (involving dispute between widow

and estate).  The status quo, the District says, is the situation as it

was before Dr. Risen issued his order, and, because under Illinois

law Dr. Risen's order has been stayed, the District does not have to

pay any money to the parents.

The parents disagree.  They say that the status quo is Dr.

Risen's order, and that the IDEA's "stay put" provision operates as

an "automatic" preliminary injunction, keeping Dr. Risen's order in

effect despite the District's appeal.  See 20 U.S.C. § 1415(j) ("during

the pendency of any proceedings ... unless the State ... and the

parents otherwise agree, the child shall remain in the then-current

educational placement"); 34 C.F.R. § 300.518(d) ("If the hearing

officer in a due process hearing ... agrees with the child's parents

that a change of placement is appropriate, that placement must be

treated as an agreement between the State and the parents…");

Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302, 400 F.3d 508,

511 (7th Cir. 2005) (describing "stay put" provision as "imposing an

automatic statutory injunction"); Beth B. v. Van Clay, 126

F.Supp.2d 532, 533 (N.D. Ill. 2000) ("Congress has provided a

mandatory 'stay put' requirement … which functions, in essence, as

an automatic preliminary injunction.").

The parents criticize the District for not citing a single

"education case" in which an appeal of a hearing officer's order

acted as a supersedeas.  They note that they have not identified

"any such cases in our Circuit."  (Defs.' Mem. at 3.)  Neither has the

Court identified such a case.

The parents emphasize that the IDEA's "stay put" provision

"exists to protect the rights of parents and children, not school

districts."  (Id. at 4.)  Because school officials have a "natural

advantage" in disputes with parents, Congress employed

"procedural safeguards to insure the full participation of parents

and proper resolution of substantive agreements."  Sch. Comm. of

Burlington v. Dep't of Educ., 471 U.S. 359, 373 (1985) (quotation

omitted).  The purpose of the "stay put" provision is to safeguard the rights of the parents and their child throughout the judicial process.  Id. at 373; Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 82, 83 (3d Cir. 1996) ("Given the protective purpose underlying the [stay put] provision, it is often invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district; the provision is used to block school districts from effecting unilateral change in a child's educational program.").  Thus, the parents argue, the IDEA "demands a child's educational placement be prioritized, even if over the interest of a school district."  (Defs.' Mem. at 4.)

In Susquenita Sch. Dist. v. Raelee S., the Third Circuit addressed a similar issue.  96 F.3d 78 (3d Cir. 1996).  The parents there, objecting to their school district's proposed IEP, removed their daughter to enroll her in private school.  The due process hearing officer sided with the school district, but a three-member administrative appeals panel sided with the parents.  (Such an administrative appeal is possible when the initial hearing is conducted by a local education agency.)  The school district then appealed in federal district court and asked the district court to

stay the administrative panel's decision directing the school district to reimburse the parents for the cost of the private school.  The district court denied the motion.

On interlocutory appeal of the district court's denial of the school district's motion to stay, the Third Circuit noted that, typically, the IDEA's "stay put" provision is used by parents to keep their child <u>in</u> a public school classroom while their school district's proposal to remove the child is appealed.  <u>Id</u>. at 83.  The <u>Susquenita</u> parents, however, had removed their daughter <u>from</u> public school and enrolled her in private school.  But the parents argued that, because the administrative panel had ultimately ruled in the parents' favor, the school district was required to pay for the private school.

The <u>Susquenita</u> school district argued that the pendant placement was still the public school, and that that status "cannot be altered by an administrative ruling in the parents' favor."  <u>Id</u>. at 84.  But the Third Circuit disagreed.  "Accepting this position … would mean that the [administrative] decision in favor of the parents is of no practical significance unless and until it is affirmed by a decision that cannot be or is not appealed."  <u>Id</u>. at 84.  Noting

that the IDEA's "stay put" provision was "drafted to guard the interests of parents and their children," the Third Circuit said that the district could not use it "as a weapon … to force parents to maintain a child in a public school placement which the [administrative hearing panel] has held inappropriate." Id. at 84.

The Third Circuit held that once the administrative panel ruled in favor of the parents, the pendant placement became the private school, and the district was obligated to pay for it. Id. In effect, the administrative panel's decision constituted an "agreement" between the state and the parents under the "stay put" provision. Id.; see 20 U.S.C. § 1415(j)[1] ("during the pendency of any proceedings … unless the State … and the parents otherwise agree, the child shall remain in the then-current educational placement"); 34 C.F.R. § 300.518(d) ("If the hearing officer in a due process hearing … agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents…"); Sch. Comm. of Burlington v. Dep't of Ed., 471 U.S. 359 (1985) (administrative appeals panel's decision in parents' favor "would seem to constitute

---

[1] The Susquenita court actually cited 20 U.S.C. § 1415(e)(3), which is where the "stay put" provision was before it moved to its current location, 20 U.S.C. § 1415(j).

agreement by the State to the change of placement"); M.R. v. Ridley Sch. Dist., 744 F.3d 112, 118 (3d Cir. 2014) ("administrative ruling validating the parents' decision to move their child … to a private school will, in essence, make the … private school [the] 'then-current educational placement' for purposes of the stay-put rule"), cert. denied, 135 S.Ct. 2309 (2015); Mt. Vernon Sch. Corp. v. A.M., No. 11-cv-0637, 2011 U.S. Dist. LEXIS 56049, *5 (S.D. Ind. May 24, 2011) ("In other words, the [hearing officer]'s decision supplants the status quo.").

Here, the parents removed R.P. from the District, enrolled her in private, in-home ABA schooling, and ultimately prevailed in front of the hearing officer, Dr. Risen.  Thus, under the statute, regulation, and case law cited above, Dr. Risen's ruling in the parents' favor constitutes an "agreement" between the parents and the state, creating a new "status quo" that is unaffected by the District's appeal.

Because the status quo is Dr. Risen's order, as opposed to the situation that existed prior to the entry of Dr. Risen's order, the Court now addresses the District's motion for a preliminary injunction staying Dr. Risen's order.

**B.     The motion for preliminary injunction**

To prevail on its motion for preliminary injunction, the District must establish: (a) that it is likely to prevail on the merits; (b) that it is likely to suffer irreparable harm without an injunction; (c) that the harm it would suffer is greater than the harm R.P. would suffer if the injunction were granted; and (d) that the injunction is in the public interest.  See Dominique L. v. Bd. of Ed., No. 10-C-7819, 2011 U.S. Dist. LEXIS 19039 (N.D. Ill. Feb. 25, 2011); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78 (3d Cir. 1996).

**1.     Likelihood of success on the merits**

At this stage, the parties have not briefed the merits of the District's appeal.  However, having reviewed Dr. Risen's order, the underlying record, and the parties' written and oral arguments on the District's motion for preliminary injunction, the Court cannot say that the District has a strong likelihood of success on the merits.  Clearly, R.P. had innumerable behavioral problems throughout the 2013-14 school year, and all parties struggled to find an effective means of providing her with a free appropriate public education.  The documents in the record—including emails exchanged between R.P.'s mother and the District and notes taken

by R.P.'s teachers regarding R.P.'s behavior at school—depict the increasing frustration felt by the parents, the District, and R.P.'s teachers and aides, all of whom faced the daunting challenge of caring for a deeply troubled young girl.[2]  There is no doubt that the circumstances facing the parties were and are difficult ones.

Based on this record, the Court finds that it is more likely than not that Dr. Risen did not err in his ruling.  R.P.'s urological problems—requiring bathroom breaks as often as every 20 minutes—more likely than not prohibited her from attending the Hope Institute, as Dr. Risen found.  Further, R.P.'s behavioral problems had increased dramatically during the 2013-14 school year (see Record at H.O. 407-409, d/e 64-3 at 114-116), making it more likely than not reasonable for Dr. Risen to have concluded that home ABA therapy was necessary before any return to the public school.  Indeed, all 3 of the parents' expert witnesses recommended home-based instruction for R.P. for 6 months to 1

---

[2] See, e.g., April 15, 2014 report ("Each toilet incident when she couldn't 'poopy' turned into a 'meltdown' (5 total) that last from 4 minutes to 39 minutes. Can you send more changes of clothes please?"), PLF 324, d/e 64-8 at 53; April 24, 2014 email ("▇▇▇▇ ripped Mrs. ▇▇▇s glasses off her face, pulled and broke the security tie that was on the cabinet doors, and hit and cracked the telephone jack box."), PLF 76, d/e 64-5 at 98; May 7, 2014 notes ("skipping down the hall going to PE, saying Fuck, Fuck, Fuck. Hands in vagina several times today."), PLF 117, d/e 64-5 at 139; May 13, 2014 notes ("several meltdowns with self injuries"), PLF 118, d/e 64-6 at 1; May 29, 2014 notes ("[R.P.] said 'sick sex' at snack time. Bit ▇▇▇ and head butted ▇▇▇ in the knee. ▇▇▇▇ had to go get xrays – bruised kneecap."), PLF 120, d/e 64-6 at 3.

year.  (Record at H.O. 548, d/e 64-4 at 68.)  Further, the Court's
finding that it is more likely than not that Dr. Risen did not err is
consistent with the deference courts are to give to an independent
hearing officer's findings in IDEA cases.  <u>Board of Ed. v. Illinois</u>
<u>State Bd. of Ed.</u>, 41 F.3d 1162, 1167 (7th Cir. 1994) (affirming
district court's decision to affirm hearing officers' decision favorable
to parents).

Moreover, the portion of Dr. Risen's order directing the District
to pay for R.P.'s ongoing in-home ABA therapy merits special
attention.  Even if the District <u>were</u> to have a strong likelihood of
success on the merits of its appeal of Dr. Risen's order, issuance of
a preliminary injunction staying the District's obligation to pay for
what amounts to R.P.'s ongoing private schooling would be
improper.  During the pendency of an appeal, a school district is
obligated to pay for a student's private schooling once a hearing
officer confirms that private schooling is the proper placement.  <u>See</u>
<u>Susquenita Sch. Dist. v. Raelee S.</u>, 96 F.3d 78, 81 (3d Cir. 1996)
("the IDEA and its administrative process favor imposing financial
responsibility upon the local school district as soon as there has
been [an administrative decision affirming the private placement]")

(affirming district court, which found that "under current case law, the [school] district would not be entitled to recover funds expended to maintain [the student] in private school even if it were to prevail on appeal"); Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635, 641 (9th Cir. 1990) (school district required to pay for private schooling once hearing officer confirms parents' private placement).  Because the District is obligated to pay until it receives a favorable ruling on the merits from this Court, preliminarily enjoining the payment aspect of Dr. Risen's order would, therefore, be improper.

This ruling is consistent with the Supreme Court's analysis of the policy imperatives behind the IDEA:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by the IEP has passed.  In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or to pay for what they consider to be the appropriate placement.  If they choose the latter course … it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not … be reimbursed …. If that were the case, the child's right to a free appropriate public education … would be less than complete.

<u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 370 (1985).  Although <u>Burlington</u> involved a request for retroactive reimbursement, the <u>Susquenita</u> court persuasively interpreted the Supreme Court's policy analysis quoted above to support requiring school districts to pay for private school once the private placement is affirmed by a hearing officer.  <u>Susquenita</u>, 96 F.3d at 87 ("Families without means would be hard pressed to pay for private education in what will almost invariably be the significant time lapse between a ruling in their favor and the ultimate close of litigation. ... Without interim financial support, a parent's 'choice' to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset."); <u>accord</u> <u>Clovis</u>, 903 F.2d at 641 (after administrative ruling affirming parents' removal of student from public school, school district is responsible for maintaining private school placement "through the pendency of court review proceedings"); <u>Houston Indep. Sch. Dist. v. VP</u>, 566 F.3d 459, 476 (5th Cir. 2009) (hearing

officer may require reimbursement of private school costs upon finding that FAPE has not been made available).

In sum, the District's likelihood of success on the merits of its appeal is not high. And, even if the District had a high likelihood of success on the merits, preliminarily enjoining the portion of Dr. Risen's order directing the District to pay for R.P.'s ongoing ABA therapy would still be erroneous.

### 2.   Irreparable harm

The District claims that it will suffer irreparable harm if it is forced to pay for R.P.'s ongoing in-home ABA therapy, on the ground that, because the District is obligated to pay for the ABA therapy during the pendency of this appeal (see above), the District will not be able to seek reimbursement from R.P.'s parents even if it ultimately prevails on the merits.

Some courts have explicitly rejected the District's argument. In <u>Dep't of Ed. v. C.B.</u>, the court rejected the school district's claim that "its monetary harm [would be] irreparable because the IDEA precludes a school district from recovering money paid to reimburse parents to an administrative decision, even if the school district prevails on appeal."  No. 11-00576, 2012 U.S. Dist. LEXIS 7845, *8

(D. Ha. Jan. 24, 2012).  The court criticized the school district for failing to cite to "any statutory provision" and for citing cases that related to sovereign immunity rather than to the IDEA.  Id. at *9-10. In San Francisco Unified Sch. Dist. v. S.W., the court reached the same conclusion.  No. C-10-5211, 2011 U.S. Dist. LEXIS 17745, *6 (N.D. Ca. Feb. 9, 2011).  The school district there had argued that recovering from the parents would "likely be unsuccessful and may require additional legal action."  Id.  The court's opinion does not explain why the District believed it would be unsuccessful; it may have been because of the parents' limited ability to pay.  However, neither court addressed the issue of how a school district could properly recover private tuition expenditures ordered by a hearing officer, if reimbursement by the parents is not available even when the school district ultimately wins on appeal.

Meanwhile, numerous courts have found that parents cannot be forced to reimburse the school district for private tuition expenses made after a hearing officer affirms the student's private placement.  See Jenkins v. Squillacote, 935 F.2d 303, 307 n.3 (D.C. Cir. 1991) (rejecting school district's argument that court could direct parents to reimburse school district for expenses authorized

by hearing officer) ("It would be absurd to imagine a trial court ordering parents to reimburse a school system for the costs of a hearing officer's erroneous placement of their child, and any such order would clearly be an abuse of discretion."); Town of Burlington v. Dep't of Ed. for the Commonwealth of Mass., 736 F.2d 773, 800 (1st Cir. 1984) ("Retroactive reimbursement by parents is not 'appropriate' relief within the meaning of [the IDEA] where they relied on and implemented a state administrative decision in their favor ordering a particular placement."), aff'd, 471 U.S. 359 (1985); E.Z.-L. v. New York City Dep't of Ed., 763 F.Supp.2d 584, 599 (S.D.N.Y. 2011) (declining to order parents to reimburse school district); New York City. Dep't of Ed. v. S.S., No. 09 Civ. 810, 2010 U.S. Dist. LEXIS 25133, *6 (S.D.N.Y. Mar. 17, 2010) (finding school district not entitled to reimbursement for private tuition expenses); District of Columbia v. Jeppsen, 468 F.Supp.2d 107, 112 (D.D.C. 2006) ("requiring parents to reimburse school districts for tuition and other expenses paid to private schools under the stay-put provision is wholly inconsistent with the intent and spirit of the provision itself").

The Seventh Circuit has described it as an "open question" whether, "if the parents [ultimately] lose their challenge, they must reimburse the [district] for the expense of the private-school placement to which the child, it turns out, was not entitled." <u>Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302</u>, 400 F.3d 508, 510 (7th Cir. 2005) (Posner, J.).  In <u>Casey K.</u>, the school district had continued to pay for the student's private schooling while the parties awaited the hearing officer's ruling.  And even there, though it did not decide the question, the Seventh Circuit at least suggested that the correct answer is to protect the parents, noting that "[t]he risk of an adverse decision by a hearing officer that would require [the parents to reimburse the school district for] the private school's charges would deter many parents from enrolling their child in a private school unless they were certain of their right to do so." <u>Id</u>. at 511.

Because a persuasive body of case law indicates that the parents need not reimburse the District for R.P.'s ongoing ABA therapy even if the District wins its appeal on the merits, a money damages award of those costs to the District if the District were to prevail on the merits of its appeal would be improper.  Even so, the

Court questions whether this truly constitutes "irreparable harm" to the District.  As explained above, the District must make the payments directed by Dr. Risen regardless of whether the District wins on appeal.  The District views this as "harm," but it could more accurately be characterized as simply the discharging of a statutory requirement.  See Ravenswood City Sch. Dist. v. J.S., No. 10-03950, 2010 U.S. Dist. LEXIS 126629, *15 (N.D. Cal. Nov. 18, 2010) (denying school district's motion for preliminary injunction) ("Though the District claims that there is no legal way for it to recover payments made during the pendency of appeal … that is simply how the stay put provision of the IDEA operates.  … [T]he District's argument that the [private tuition] payment … constitutes irreparable harm is incompatible with the IDEA…") (quotations omitted).  Nevertheless, the Court assumes for the purpose of deciding this motion that paying for R.P.'s ongoing ABA therapy, as ordered by Dr. Risen, constitutes irreparable harm to the District. See Susquenita, 96 F.3d at 80-81 (at district court level, finding "merit" in argument that school district faced irreparable harm, because school district would not be entitled to recover money expended even if it were to win on appeal).

The District claims that it also faces irreparable harm arising from Dr. Risen's order directing R.P.'s transition back to public school. Dr. Risen's order directs the District to develop a plan to reintroduce R.P. to "an appropriate self-contained classroom provided by the District for students with autism." (Dr. Risen July 20, 2015 Order at 38.) The order further directs the District to follow the recommendations of Dr. Glen Aylward, who wrote in December 2014 that R.P. "should be slowly reintroduced to school with [a] new teacher and aides or provided a completely different school." (Id. at 22-23.) The District says that following Dr. Aylward's recommendations—as Dr. Risen's order commands— would force the District either to replace its existing autism staff, or to move its existing 13 students with autism from their self-contained autism classroom at Eisenhower Elementary to a new classroom in a new building.

The record does not reflect whether the staff in the District's self-contained autism classroom would be "new" to R.P., as R.P. was never moved from her second grade classroom to the District's self-contained autism classroom during the 2013-14 school year. Despite this lack of clarity, all parties apparently—based on the

parties' statements at oral argument—assume that the staff in the
existing self-contained autism classroom would <u>not</u> be new to R.P.
Based on this assumption, the District says that to comply with Dr.
Risen's order the District would need either to replace its existing
autism staff, or to move the existing 13 students from their self-
contained autism classroom at Eisenhower Elementary to a new
classroom in a new building.  Either approach, the District says,
would disrupt the existing 13 students' educations and require 13
separate IEP meetings—one for each student affected by the
change.  (<u>See</u> Affidavit of Mekelle Neathery, d/e 16-1 at ¶ 7.)  Like
the unrecoverable costs of R.P.'s ABA schooling, this disruption
would likely qualify as irreparable harm—if not to the District, then
to the 13 students.

### 3. **Balance of harms**

The potential harm to R.P. is apparent.  R.P. is currently
receiving education—in the form of home-schooling with ABA
therapy—that her parents and Dr. Risen consider appropriate for
her special needs.  However, the parents have expressed concern
about their continued ability to afford the ABA program in light of
R.P.'s father's unemployment status and R.P.'s mother's uncertain

health insurance benefits.  (See Declaration of O.P. (attached to

Defs.' Reply [sic] Br., d/e 54).)  Entering a preliminary injunction

staying Dr. Risen's order, then, would potentially throw R.P.'s

education into turmoil.  With Dr. Risen's order stayed, R.P.'s

parents face a serious risk of being unable to afford the home ABA

therapy and being left with no choice but to send R.P. back to

public school before R.P. is ready for that transition.  The potential

harm to R.P.'s educational and psychological development is

obvious.

   The District, meanwhile, faces monetary harm: Dr. Risen has

ordered the District to reimburse the parents for $10,435.62 and to

pay for at least 6 months of ABA therapy.  The cost of the in-home

ABA therapy is around $13,370 per month.  Thus, by the Court's

calculation, denying the motion for preliminary injunction would

cost the District at least $90,655.62, which the District will not

likely be able to recover even if it ultimately prevails on this appeal.

   The Court also recognizes the potential harm to the 13

students caused by disrupting their educations as a result of R.P.'s

transition back to public school in a manner consistent with Dr.

Aylward's recommendations.  While it is possible that moving the

students to a new building or replacing their teachers would be
minimally disruptive, the unchallenged Affidavit of Mekelle Neathery
(d/e 16-1) suggests that the disruption would be severe.

Comparing the potential harms to R.P. and to the District
itself, the potential harm to R.P. almost certainly outweighs the
monetary harm to the District. See Dominique L., 2011 U.S. Dist.
LEXIS 19039 at *17 (N.D. Ill. Feb. 25, 2011) ("The most serious
harm to [the school district] is the monetary cost of providing
services.  The cost to the school district does not outweigh the
irreparable harm to [the student]."); Susquenita, 96 F.3d at 80 (3d
Cir. 1996) (finding irreparable monetary harm to school district not
sufficient to justify staying hearing officer's decision favorable to
parents).

As for the potential harm to the 13 students, the Court takes
seriously the District's concern that implementing Dr. Risen's order
would require the District to replace its existing autism staff or
move its existing self-contained autism classroom to a new
building—upending the education of 13 students.  However,
transitioning R.P. back to public school in a manner consistent with
Dr. Risen's order would not necessarily require such drastic action.

Dr. Risen has directed the District not to transition R.P. back to the same building with the same teachers.  If the staff in the existing self-contained autism classroom would be new to R.P., then R.P. could transition to that classroom without violating Dr. Risen's order.  If the staff would <u>not</u> be new to R.P., then, while two possible ways of complying with the order are to replace the existing autism staff or to move the existing autism class to a different building, any number of other possible solutions also exist.  Whether such solutions involve the Four Rivers Special Education District (with which the District apparently has some relationship), as suggested by the parents at oral argument, or some other means, is not for the Court to direct or decide.  As it is, without evidence in the record regarding, for example, the District's operating budget or other serious constraints, the Court cannot find that transitioning R.P. back to public school as Dr. Risen has ordered necessarily requires upending the educations of the 13 students in the existing self-contained autism classroom.  Dr. Risen's order simply commands that R.P. not be returned to the same building <u>with</u> the same teachers that she had before.  How to effectuate that order is a question left to the District's IEP team.

Moreover, the litigation before this Court may conclude before the IEP team decides that it is appropriate to transition R.P. back into the classroom.

### 4. Public interest

Finally, the public interest likely favors denying the request for a preliminary injunction. The public interest favors disabled students' receiving a free and appropriate public education. See Olson v. Robbinsdale Area Schs., No. 04-2707, 2004 U.S. Dist. LEXIS 9858, *13 (D. Minn. May 28, 2004) ("Where Congress has created a special enforcement system, the public interest is on the side of maintaining that system's integrity."). Further, the explicit purpose of the IDEA's "stay put" provision is "to guard the interests of parents and their children." Susquenita, 96 F.3d at 84. Districts cannot use the IDEA "as a weapon … to force parents to maintain a child in a public school placement which the [administrative hearing panel] has held inappropriate." Id. As the Third Circuit put it, "Nothing in the Act or its legislative history convinces us that Congress intended to shield school districts from financial responsibility prior to the close of litigation." Id. at 85; see also Burlington, 471 U.S. at 372 ("The Act was intended to give the

handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives."). Indeed, the District has not argued that the public interest will be harmed by denying a preliminary injunction of Dr. Risen's order.

### 5.   Analysis

Even assuming that the District faces irreparable monetary harm if the Court denies the preliminary injunction, that harm is outweighed by the potential harm to R.P. if her in-home ABA therapy is discontinued. Further, the District is more likely than not to lose on the merits, and the public interest likely favors the parents. While the Court takes seriously the District's concern about the potential harm to the 13 students in the District's self-contained autism class, disrupting those 13 students' educations is not clearly necessary to comply with Dr. Risen's order. Considering these factors together, the Court concludes that the District's motion for preliminary injunction should be denied.

## V.   Conclusion

The Court LIFTS the temporary stay entered on September 18, 2015, and DENIES the District's motion for preliminary injunction

(d/e 16).  As of this order's entry, Dr. Risen's July 20, 2015 order

operates in full effect.   To protect the privacy of the minor child

involved in this case, the Clerk of the Court is DIRECTED to seal

this opinion.

ENTERED:  December 2, 2015

FOR THE COURT:              s/ Sue E. Myerscough
                           SUE E. MYERSCOUGH
                           UNITED STATES DISTRICT JUDGE